63 A.3d 197

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTEC-TION, PLAINTIFF–RESPONDENT, v. ROBERT AND MI-CHELLE HUBER, DEFENDANTS–APPELLANTS.

Argued October 23, 2012—Decided April 4, 2013.

340

*Howard P. Davis* argued the cause for appellants (*Mr. Davis,* attorney; *Mr. Davis, Anne M. Ronan, Deborah J. Ritter, Joanne C. Kalas,* and *Eric M. Grille,* on the briefs).

*Gary W. Wolf, II,* Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Mr. Wolf* and *Ms. Raksa,* on the briefs).

Justice LaVECCHIA delivered the opinion of the Court.

The New Jersey Legislature passed the Freshwater Wetlands Protection Act (FWPA or the Act) in 1987 as a means of protecting and regulating New Jersey's sensitive freshwater wetlands. *N.J.S.A.* 13:9B-1 to -30; *In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 482, 852 *A.*2d 1083 (2004). The Legislature pronounced it to be of public importance "to preserve the purity and integrity of freshwater wetlands from random, unnecessary or undesirable alteration or disturbance." *N.J.S.A.* 13:9B-2. Seeking "to maintain a delicate balance between environmental interests and the rights of property owners," *In re Freshwater Wetlands Prot. Act Rules, supra,* 180 *N.J.* at 482, 852 *A.*2d 1083, the FWPA established a permitting process to which a property owner must submit before engaging in an activity that risks disturbing freshwater wetlands or protected transition areas near wetlands. The permit review and approval scheme balances a property owner's ability to make use of land on or near freshwater wetlands and the public's interest in preserving these natural resources from impairment that would impede the wetlands' ability to fulfill their integral environmental role.

The FWPA also confers on the New Jersey Department of Environmental Protection (DEP or Department) a statutory right to enter property "for the purpose of conducting inspections,

sampling of soil or water, ... and for otherwise determining compliance with the provisions of [the] act." *N.J.S.A.* 13:9B–21(m). The regulatory scheme contains a careful series of steps through which the DEP may secure compliance with its inspection and monitoring of freshwater wetlands. This case requires us to examine that scheme in the context of a regulatory enforcement action.

A civil penalty and restoration remedy was imposed on petitioners, Robert and Michelle Huber, as a result of FWPA violations committed on their land, which had been developed subject to FWPA permit conditions. A FWPA General Permit and Transition Area Waiver, issued to predecessors in title and duly recorded, controlled activities in certain areas of the Hubers' property. An administrative hearing substantiated the violations and resulted in the minimum fine and a restoration remedy for the affected property.

On appeal from the final administrative action of the DEP, the Hubers raised for the first time a constitutional argument contesting the right of a DEP inspector to have entered their land without securing a warrant in advance. They argued that the inspector's testimony, based on observations made during that inspection, should not have been included in the record and, therefore, the violations had not been substantiated. The Appellate Division rejected the Hubers' constitutional challenge, in addition to all other arguments raised, and affirmed the administrative penalty.

Based on the reasoning expressed herein, which adopts a different view than that of the Appellate Division as to how the FWPA inspection scheme operates, and operates consistently within constitutional parameters, we affirm the judgment imposing an administrative penalty and a restoration remedy for disturbed freshwater wetlands on the Hubers' property. In recognition of the importance of resolving whether the FWPA's inspection scheme is consistent with the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Consti-

tution, we address the issue of administrative searches of permit-restricted residential property under the FWPA. However, our holding that affirms the Appellate Division judgment is rooted in the fact that the record contains sufficient credible evidence, exclusive of the inspector's testimony that was challenged on appeal, to sustain the finding of violations of the FWPA permit.

## I.

Because this matter involves the intersection of the private property interests of freshwater wetlands permit holders and the right of reasonable entry that is conferred on state officials by the FWPA, we begin with some background on the Act before turning to the protracted factual and procedural history pertinent to this appeal.

Prior to the FWPA, New Jersey's freshwater wetlands were regulated by the United States Army Corps of Engineers under the federal Clean Water Act (CWA). *In re Freshwater Wetlands Prot. Act Rules, supra,* 180 *N.J.* at 483, 852 *A.*2d 1083; *see* 33 *U.S.C.A.* § 1344. The CWA permitted states to assume responsibility for the federal program provided the state program complied with the federal program and was equally stringent. *Ibid.* Unsatisfied by the extent of federal regulation of freshwater wetlands, the Legislature assessed whether the state should assume that regulatory responsibility. *See generally In re Freshwater Wetlands Prot. Act Rules,* 238 *N.J.Super.* 516, 520–22, 570 *A.*2d 435 (App.Div.1989) (discussing ramifications of state takeover of federal program). As explained by the Appellate Division when addressing the Act's initial implementation,

[b]ecause the Legislature found that ... freshwater wetlands protect and preserve drinking water supplies, provide a natural means of flood and storm drainage protection, serve as a transition zone between dry land and water courses retarding soil erosion, provide essential breeding, spawning, nesting and wintering habitats for a major portion of the State's fish and wildlife and maintain a critical base flow to surface waters through their gradual release of stored flood waters and ground water, particularly during a drought, it concluded that these inland waterways and freshwater wetlands need vigorous protection. *N.J.S.A.* 13:9B–2. The Legislature asserted that

in order to advance the public interest in a just manner the rights of persons who own or possess real property affected by this Act must be fairly recognized and balanced with environmental interests; ... the public benefits arising from the natural functions of freshwater wetlands, and the public harm from freshwater wetland losses, are distinct from and may exceed the private value of wetland areas.

[*N.J.S.A.* 13:9B–2.]

The Legislature then determined that, in this State, pressures for commercial and residential development define the pace and pattern of land use. Therefore, it was in the public interest to establish a program for systematic review of activities in and around freshwater wetland areas "designed to provide predictability in the protection of freshwater wetlands." *Ibid.* The Legislature declared

that it shall be the policy of this State to preserve the purity and integrity of freshwater wetlands from random, unnecessary or undesirable alteration or disturbance; and that to achieve these goals it is important that the State expeditiously assume the freshwater wetlands permit jurisdiction currently exercised by the United States Army Corps of Engineers pursuant to the Federal Act and implementing regulations.

[*N.J.S.A.* 13:9B–2.]

[*Id.* at 519, 570 *A.*2d 435.]

Accordingly, the Legislature enacted the FWPA, which provided for greater protection to the state's wetlands. *See In re Freshwater Wetlands Prot. Act Rules, supra,* 180 *N.J.* at 483, 852 *A.*2d 1083 (noting that FWPA authorizes DEP to regulate more wetlands than CWA, regulates more activities than CWA, and unlike CWA, subjects freshwater wetlands transition areas to regulatory control). The FWPA created "a statutory scheme which would not only regulate any activity which could occur in freshwater wetlands, but which would also assume the regulatory function over disposal of dredged or fill material heretofore provided by the Army Corps of Engineers under the § 404 program (*N.J.S.A.* 13:9B–2)." *In re Freshwater Wetlands Prot. Act Rules, supra,* 238 *N.J.Super.* at 520, 570 *A.*2d 435.

Freshwater wetlands, defined as areas "inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support ... a prevalence of vegetation typically adapted for life in saturated soil conditions," *N.J.S.A.* 13:9B–3, are divided into three categories:

In the first, and most highly protected category, are freshwater wetlands of exceptional resource value. These wetlands are defined by their discharge points and by whether they are present habitats for threatened or endangered species or whether they have been established as suitable for breeding, resting or feeding by threatened or endangered species during the normal period those species would use the habitat. *N.J.S.A.* 13:9B–7a(2). There are two lesser protected categories: freshwater wetlands of ordinary value, which are defined as those wetlands which do not exhibit the characteristics of freshwater wetlands of exceptional resource value and which are certain isolated wetlands, man-made drainage ditches, swales or detention facilities, *N.J.S.A.* 13:9B–7b; and freshwater wetlands of intermediate resource value, which are all freshwater wetlands not included within the other two categories. *N.J.S.A.* 13:9B–7c.

[*In re Freshwater Wetlands Prot. Act Rules, supra,* 238 *N.J.Super.* at 518–19, 570 *A.*2d 435.]

The FWPA also protects "transition areas," which are

areas of land adjacent to freshwater wetlands which minimize adverse impacts on the wetlands or which serve as an integral component of the wetlands ecosystem. *N.J.S.A.* 13:9B–3. They are more specifically defined in terms of distance and type in *N.J.S.A.* 13:9B–16. The type of activities limited in transition areas, as well as the circumstances under which a waiver of the requirements may be obtained, are described in *N.J.S.A.* 13:9B–17 and *N.J.S.A.* 13:9B–18.

[*Id.* at 522, 570 *A.*2d 435.]

In this comprehensive environmental legislation that balances public and private interests, the Legislature decreed that property owners "seeking to engage in regulated activities in … wetlands must apply for and secure either a general or an individual permit from the DEP." *In re Freshwater Wetlands Prot. Act Rules, Statewide General Permit, Cranberry Expansion,* 180 *N.J.* 415, 422–23, 852 *A.*2d 167 (2004) (footnote omitted). Regulated activities include

(1) The removal, excavation, disturbance or dredging of soil, sand, gravel, or aggregate material of any kind;

(2) The drainage or disturbance of the water level or water table;

(3) The dumping, discharging or filling with any materials;

(4) The driving of pilings;

(5) The placing of obstructions;

(6) The destruction of plant life which would alter the character of a freshwater wetland, including the cutting of trees[.]

[*N.J.S.A.* 13:9B–3.]

The Legislature authorized the DEP to consolidate regulatory programs affecting activities in freshwater wetlands with the

FWPA permit process. *N.J.S.A.* 13:9B–5(a). It established procedures for obtaining letters of interpretation and for obtaining a permit to engage in a regulated activity, *N.J.S.A.* 13:9B–8, –9; created a "rebuttable presumption that there is a practicable alternative to any nonwater-dependent regulated activity that does not involve a freshwater wetland, and that such an alternative . . . would have less of an impact on the aquatic ecosystem," *N.J.S.A.* 13:9B–10(a); delineated the considerations to be factored into assessment of the public interest in allowing the activity on wetlands when weighed against the rebuttable presumption that an alternative could be developed that would not affect the wetlands, *N.J.S.A.* 13:9B–10, –11; and identified conditions that may be attached to the issuance of permits, *N.J.S.A.* 13:9B–13. *In re Freshwater Wetlands Prot. Act Rules, supra,* 238 *N.J.Super.* at 523, 570 *A.*2d 435. Absent issuance of a FWPA permit, or unless otherwise permitted under the Act, regulated activity on or affecting freshwater wetlands is strictly prohibited. *See ibid.*; *see also N.J.S.A.* 13:9B–17 (addressing prohibited activity in transition areas), –18 (providing for waivers in connection with activity in transition areas). Violations of any provision of the Act and its rules and regulations, or of a permit or order issued pursuant to the Act's provisions, may result in imposition of civil penalties, costs, and injunctive relief. *See N.J.S.A.* 13:9B–21(a) to (e).[1]

With that structure and background of the statutory scheme as a backdrop, we turn to the Act's application to the property owned by the Hubers.

## II.

The property—11 Cider Mill Road, Block 90, Lot 17.11, Clinton Township, Hunterdon County—was once part of a larger parcel of land owned by Sidewood, Inc. On May 28, 1991, the DEP issued a Letter of Interpretation (LOI) classifying the wetlands on Side-

---

[1] The Attorney General may file criminal charges in certain instances. *See N.J.S.A.* 13:9B–21(f).

wood's property as intermediate resource value, requiring a fifty-foot transition area. The LOI stated that any activities within the wetland area were subject to a freshwater wetlands permit and that Sidewood could "rely upon this boundary determination for a period of five years from the date of this letter pursuant to the [FWPA] Rules."

On October 7, 1992, Sidewood was issued a Freshwater Wetlands General Permit and a Transition Area Waiver–Averaging Plan (collectively the Wetlands Permit). In respect of Sidewood's plan to develop the property, the Wetlands Permit allowed Sidewood to encroach into the fifty-foot transition area where it "has been determined by the [DEP] to be necessary to accomplish the authorized activities." That encroachment was to be compensated by increasing the size of the transition area in other areas on a 1:1 basis.[2] The Wetlands Permit also required Sidewood to

> sign a [DEP] approved deed restriction ... which shall be included on the deed, and recorded in the office of the County Clerk [of Hunterdon County]. The Wetlands Permit mandated that the restriction shall state that no regulated activities shall occur in the modified transition area or adjacent wetlands without the prior approval of the DEP. The Wetlands Permit also stated that the restriction shall run with the land and be binding upon all successive owners.

Sidewood constructed a house on the property. On August 8, 1994, ownership of the parcel was transferred to the Schmidts. On August 16, 1994, the Hunterdon County Clerk recorded the deed, attached to which was a document entitled "METES AND BOUNDS" stating that the property was "[s]ubject to NJDEPE [3][1] Freshwater Wetlands Permit No. 1006–91–0017.5TW, which is dedicated to Clinton Township by conservation easement described as follows," and delineating the metes and bounds of the conservation easement. The conservation easement extended to within eighteen feet of the southern back corner and thirteen feet

---

[2] The wetlands and associated transition areas are depicted on a 1992 Stream Encroachment Map and a 1992 Wetlands Delineation Map, which are part of the record.

[3] NJDEPE is now known as the DEP.

of the northern back corner of the house. Additionally, the easement is depicted on a map, entitled "Septic As–Built," dated July 1, 1994, showing a patio/deck encroaching on the conservation easement.

The Schmidts sold the property to the Reids on July 28, 1997. The deed for that transaction was recorded on September 17, 1997. It did not expressly refer to the conservation easement.

The Hubers acquired the property from the Reids on January 4, 1999. Their deed stated that the property was subject to "easements and restrictions of record." A title insurance report prepared prior to closing for the Hubers, dated December 28, 1998, stated that the property was subject to a conservation easement and directed the Hubers to a map depicting the boundaries of the easement. The report also stated that the property was subject to a "Freshwater Wetlands Permit" and noted the specific deed book and pages in the Hunterdon County Clerk's office where the Schmidts' deed that referenced the Wetlands Permit by number could be found.

According to the Hubers, when they purchased the property they were unaware of any restrictions placed on the land. In the administrative proceedings, Mr. Huber stated that a mowed lawn existed in the back yard within the conservation easement when they acquired the property, but he admitted to adding fill at the end of their driveway to remedy a steep slope behind the garage. The Hubers contend they became aware of the conservation easement during a conversation with a DEP representative after a complaint had been lodged with the DEP. The DEP became involved with the Hubers based on receipt of a neighbor's complaint that the Hubers were placing fill and mowing vegetation in wetlands and transition areas.

On July 3, 2002, Michael Nystrom, a DEP supervisor in the Northern Regional Office of the Bureau of Coastal and Land Use Compliance and Enforcement, went to the Hubers' property to inspect for the presence of wetlands and their disturbance. According to his testimony, he greeted Mr. Huber, identified himself

as a DEP representative, and was permitted to inspect the relevant portion of the land.[4] During that site visit, Nystrom conducted a visual inspection of the soil and vegetation on the relevant portion of the property, and he tested soil samples by means of three soil borings using an eight-inch auger in order to determine whether there had been disturbance of freshwater wetlands and transition areas.[5]

A subsequent site meeting at the Hubers' property was conducted on August 15, 2002, by the DEP's Principal Environmental Specialist, Armand Perez, who ascertained that approximately 2500 square feet of fill had been placed on the slope below the Hubers' driveway and a lawn had been cultivated. In fact, as it was later found during the administrative hearing, Perez conducted five site visits to the Hubers' property. He determined that the Hubers' deck, patio, and a retaining wall encroached on the conservation easement. In sum, DEP representatives confirmed that improvements on the Hubers' property had encroached on the conservation easement and disturbed freshwater wetlands and protected transition areas.

---

[4] The Hubers deny granting Nystrom permission to enter their property. Mr. Huber testified at the administrative hearing that he and his family were on vacation at the New Jersey shore and were not at home in Clinton Township when Nystrom conducted his inspection. In later appellate filings, including a Petition for Certiorari to the Supreme Court of the United States, the Hubers asserted that Nystrom entered the land after disregarding their express objections.

[5] In the disturbed areas, Nystrom applied the three-parameter test for confirming the presence of wetlands as prescribed in the Federal Manual for Identifying and Delineating Jurisdictional Wetlands developed by the United States Environmental Protection Agency. *See N.J.S.A.* 13:9B–3 (defining wetlands by reference to federal manual's standards). That approach entails examining (1) whether the soil was hydric; (2) the hydrology of the soil; and (3) the vegetation present. Regarding the first criterion, Nystrom found from the three borings, taken to a depth of, at most, twelve inches, that the soils inspected were hydric. He determined that the second criterion was met because the property surrounding the disturbed areas "had hydrology consistent with wetlands," and the third was satisfied based on his observations that the sampled areas were dominated by wetlands vegetation.

On September 5, 2002, the DEP issued a Notice of Violation (NOV) under the FWPA. The NOV charged the Hubers with removal of vegetation from and placement of fill in freshwater wetlands and transition areas. Claiming that approximately 37,925 square feet of wetlands and transition areas had been disturbed on the Hubers' property, the NOV required the Hubers to submit, by October 12, 2002, a proposal to restore the areas to pre-disturbance conditions. On October 23, 2002, the Hubers requested an extension of the compliance deadline, which the Department granted and extended to November 12, 2002.

On November 26, 2002, the Hubers submitted a "proposal and schedule for compliance with the NOV" to the DEP. The proposal suggested that "individual freshwater wetland permit and transition area waiver applications would be submitted for the regulated fill and sod lawn" and that "during the permit review process the wetlands would be allowed to 'naturally regenerate.'" The proposal also outlined additional steps the Hubers would take to remediate the violations.

The DEP responded on December 6, 2002, that the proposed plan was deficient. The response outlined requirements for restoration of the freshwater wetlands and imposed a deadline of April 1, 2003, for implementation of the freshwater wetlands restoration activities. The Department did not "impose a deadline on compliance for the transition area violations provided that a good faith effort was made by the Hubers to achieve compliance."

At the Hubers' request, on April 29, 2003, a meeting of the Hubers, their attorney and engineer, and DEP representatives was convened to discuss options in respect of the NOV-alleged violations and to address the Hubers' desire to construct additional improvements of a pool and a third garage on the property. The record reflects that, prior to the complaint that led to the DEP's involvement with the Hubers' property, the Hubers had filed a FWPA permit application to make additional improvements on the back portion of their property. The parties emerged from the meeting on April 29, 2003, with a tentative agreement. It

would have allowed the deck, patio, retaining wall, and fill placed behind the driveway to remain without alteration and would have permitted a portion of the lawn to continue to be mowed, in exchange for cessation of mowing another portion of the lawn and restoration of that lawn area to its pre-disturbance state. The conceptual agreement was contingent upon the Hubers' submission of a formal plan within thirty days of the meeting. The DEP additionally informed the Hubers that the procedure for releasing the deed restrictions from the property required them to petition the DEP Commissioner for relief. *See N.J.S.A.* 13:8B–6. According to the DEP, the Hubers failed to submit a formal restoration plan within the thirty days. Although the Hubers contend that a plan eventually was submitted, the DEP disputes ever receiving it.

Accordingly, on October 2, 2003, the Department issued an Administrative Order and Notice of Civil Administrative Penalty Assessment (AONOCAPA). The AONOCAPA detailed the history of the wetlands violations in dispute and noted the Hubers' failure to submit a restoration plan to remediate the violations following the conceptual agreement reached in April 2003. The Hubers were required to submit, within thirty days, a plan for full restoration of the property to pre-disturbance conditions and were assessed a $4500 civil administrative penalty.[6] The Hubers appealed and requested an administrative hearing.

The matter was transferred to the Office of Administrative Law. Following discovery, in March 2006, the DEP filed a motion for summary decision and the Hubers filed a cross-motion for summary decision on July 18, 2006. The administrative law judge (ALJ) heard arguments on the motions on February 16, 2007, and denied both by interlocutory order dated March 9, 2007. The ALJ found that the conservation easement was valid and that the

---

[6] The amount of civil administrative penalty under the FWPA is determined by application of a point system. *See N.J.A.C.* 7:7A–16.8. The DEP could have imposed a $4500 penalty for each day that the Hubers violated the FWPA. Instead, the DEP exercised discretion and imposed a fine equivalent to a violation lasting only a single day.

Hubers were bound by it because they had both record and actual notice of the easement. However, because the ALJ found the record insufficient to determine whether the Hubers had violated the wetlands permit and conservation easement by placing "fill within the restricted areas," he determined that a plenary hearing was necessary.

A multiple-day hearing was held in February 2008. The DEP presented aerial and other photographs illustrating the disturbances to the property, as well as the testimony of Nystrom and Perez, to substantiate its claims of the presence of wetlands and the improper placement of fill in restricted areas. Nystrom testified that the Hubers were "nice" and "polite" when he arrived at the property and that they permitted him entry to the property to perform his inspection. He further testified that he specifically recalled being pleasantly surprised by the reception he received because, on an earlier date, a DEP representative had experienced a hostile rejection when she had knocked on the Hubers' door seeking entry onto the land. Under cross-examination, Nystrom expressed his belief that he could have inspected the wetland area that was subject to the FWPA-issued permit even if he had not encountered the Hubers and obtained permission to enter the land.

In his testimony, Mr. Huber admitted to placing fill in the wetlands and in transition areas. Mr. Huber also testified that he had ceased mowing some of the protected areas in 2003. In regard to Nystrom's inspection and soil sampling performed on July 3, 2002, Mr. Huber denied granting consent to Nystrom's entry onto the land, contending that he and his family were on vacation at the time.

On April 30, 2008, the ALJ issued an initial decision, finding that the DEP had shown by a preponderance of the evidence that the Hubers had placed fill and were improperly maintaining "restricted conservation and wetland areas." The decision detailed the record bases for the violations found to have occurred.

To great extent, the ALJ's findings were based on Mr. Huber's admission that he disturbed restricted areas:

Mr. Huber acknowledge[d] that in order to deal with a sharp drop-off of the land behind the driveway on the left side of the property (facing the house from the street), he placed topsoil in an area beginning about two feet from the back end of the driveway and filled in and sloped the area behind that driveway for a distance of about ten feet. The conservation easement begins behind the driveway as shown on P–1. It angles back and away to the north from the driveway [running] roughly parallel to the back of the house, crossing a portion of the retaining wall as it does so.. . It is apparent from the description of where Mr. Huber filled the land with topsoil to deal with the drop-off and an examination of the photographs of the area, P7 (top photo) and P10 b and c, that the project to remedy the condition presented by the existence of the drop-off did involve some amount of fill, apparently in the form of topsoil, being placed on and/or spread over a portion of the conservation easement.... Huber's own description of what he did is sufficient to back up the testimony of Nystrom and Perez that in order to eliminate the dangers presented by the pre-existing slope, it was necessary to both fill and then shape the resulting gentler slope, and in doing so to place and/or spread that fill into the conservation area. In an administrative proceeding, the burden of proof is by a preponderance of the credible evidence, and while the level of certainty required for proof by clear and convincing evidence or certainly by the criminal standard of beyond a reasonable doubt may not be approached by the evidence here, I **FIND** that the evidence does adequately support the conclusion that the Hubers did place fill in an area of transition, more specifically within the conservation easement area that restricted such activity on their property.

In addition to the placement of topsoil in the conservation area and up to and perhaps even into the wetland at the toe of the slope behind the garage, I **FIND** that Mr. Huber's own admission in his December 17, 2003, letter to Mr. Brubaker, as well as the photos offered as p–9a through g, establish that he placed fill, in the form of cuttings of soil taken from the front of the property, in at least one restricted area in the backyard area. While he contended that this fill was later washed out, nevertheless he did fill the limited area. It is also evident that for years the Hubers, who had bought a property that already had mowed lawn intruding into the conservation and wetland areas, continued to mow the lawn in these areas and thereby maintained it in its "manicured" condition. They do not deny this fact, although Mr. Huber contends that he later reduced the area he mowed so as to allow certain parts of the protected areas to return to natural patterns of vegetation.

In rendering his initial decision with its detailed findings, however, the ALJ did not make a specific finding as to whether the Hubers consented to Nystrom's entry onto their property to perform the July 3, 2002 inspection.

The ALJ's recommended decision upheld the AONOCAPA that required the Hubers to pay a $4500 administrative fine and to

submit a proposal for full remediation of the restricted areas within thirty days of issuance of the DEP Commissioner's final decision. Noting that the patio, deck, and retaining wall that encroached on the restricted areas were built by a prior owner, the ALJ further recommended the DEP "seriously consider" allowing those encroachments to remain.

On June 23, 2008, the Commissioner of the DEP adopted the ALJ's recommended factual findings and conclusions of law, and ordered the Hubers to comply with the AONOCAPA. The Commissioner further stated that the DEP would consider allowing the deck, patio, and retaining wall to remain if the Hubers "present[ed] a robust restoration plan for all of the other unauthorized activities" and fully restored the regulated areas "without exception—to their pre-disturbance condition."

The Hubers appealed to the Appellate Division from the final agency decision. *See R.* 2:2–3(a)(2). On August 22, 2008, the Commissioner denied a stay of the administrative decision pending appeal. In an unpublished opinion issued January 20, 2010, the Appellate Division affirmed the DEP's decision, rejecting the Hubers' appeal by agreeing, for the most part, with the ALJ's conclusions on each of the issues raised.

In their appeal, the Hubers first argued that the conservation easement was invalid and unenforceable as against them. The appellate panel disagreed, noting that the easement had been properly recorded and that "[t]he Hubers had constructive notice of the deed restriction because a reasonable inquiry would have uncovered the Wetlands Permit and its restrictions." Moreover, the panel noted that the Hubers specifically were made aware of the easement as a result of the title search performed in conjunction with their purchase of the property.

Second, the Hubers argued that the DEP failed to present evidence that they violated the FWPA. However, the appellate panel reviewed the detailed findings set forth in the ALJ's initial decision and concluded that there was ample credible evidence in

the form of testimony, including admissions by the Hubers, photographs, and official records to support the findings.

Third, the Hubers argued that the evidence collected by Nystrom should have been excluded because he did not possess an administrative search warrant when he entered to inspect the wetland areas. In addressing that argument first raised on appeal, the panel noted that the ALJ had not. resolved the discrepancy in the testimony over whether Nystrom obtained the homeowners' consent on the day of the inspection. The panel went on to state that it was "persuaded that consent was not essential and that Nystrom had statutory authority to enter the property and perform his inspection." Further, the panel opined that an administrative warrant requirement was inapplicable based on case law that established criteria for permitting warrantless administrative searches in the context of a regulated industry or activity, citing *New York v. Burger*, 482 *U.S.* 691, 699–702, 107 *S.Ct.* 2636, 2642–44, 96 *L.Ed.*2d 601, 612–14 (1987), which was applied in this state in *State v. Turcotte*, 239 *N.J.Super.* 285, 291–94, 571 *A.*2d 305 (App.Div.1990).

The Hubers additionally argued they could not be held liable for violations of the FWPA that already existed when they purchased the property and that, even if the Department proved that the conservation easement included transition areas, the Department improperly retrospectively enforced its regulations. In rejecting the arguments advanced, the panel explained that

> [i]t would defeat the purpose of the FWPA, which is to protect freshwater wetlands, if, as the Commissioner stated, violations were legalized by the sale or transfer of property. This is especially true because the Hubers had notice of the conservation easement. The DEP should be permitted to enforce the violations on the Hubers' property even though the violating structures were constructed by [previous owners].

Finally, the Hubers asserted the bars of laches, estoppel, and waiver, but the panel declared those equitable remedies inapplicable on this record.

The Hubers filed a petition for certification with this Court, which was denied. 202 *N.J.* 347, 997 *A.*2d 232 (2010). On October

7, 2010, the Hubers' motion for leave to file a motion for reconsideration as within time and an accompanying motion for reconsideration were denied. The Hubers then filed a petition for certiorari to the Supreme Court of the United States. The Court denied certiorari, noting that the appeal came from a decision of a state intermediate appellate court; however, the denial was accompanied by a statement, authored by Justice Alito and joined by Chief Justice Roberts and Justices Scalia and Thomas, questioning whether *Burger* could appropriately be applied to residential property, thus allowing the State to escape the Fourth Amendment's purview. —— *U.S.* ——, 131 *S.Ct.* 1308, 179 *L.Ed.*2d 643 (2011).

The Hubers asked this Court to reconsider certification, and that petition was granted. 213 *N.J.* 218, 61 *A.*3d 1258 (2011).

### III.

The Hubers' petition for certification emphasizes one issue: that Nystrom's testimony should have been excluded from the administrative hearing because he lacked a prior search warrant when on July 3, 2002, he entered and inspected their property.[7] They also reassert, by incorporation, all other issues raised in their Appellate Division brief.

With respect to the singular issue commanding the attention of the petition, the Hubers contend that Nystrom's warrantless intrusion onto their property was invalid under the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. They reject the DEP's argument and the appellate panel's conclusion that the FWPA authorizes the DEP to enter residential property, without

---

[7] As noted, the Hubers raised their constitutional issue for the first time in their Appellate Division brief. We presume that had it been raised at the administrative hearing level, the factual discrepancy in the testimony of Mr. Huber and Nystrom over whether Nystrom entered the land with permission on July 3, 2002, would have been resolved.

consent or a warrant, to enforce the Act. Specifically, they criticize the analogy of the regulation of freshwater wetlands to the pervasively regulated business for which *Burger* upheld a warrantless search and argue that *Camara v. Mun. Court of San Francisco,* 387 *U.S.* 523, 87 *S.Ct.* 1727, 18 *L.Ed.*2d 930 (1967), applies to this matter. They contend that *Camara* requires invalidation of this warrantless administrative search of residential property, that Nystrom's evidence be rejected, and that the wetlands violation be reversed for lack of evidence.

The DEP counters that its inspector had statutory authority to enter the Hubers' property, which was subject to a FWPA permit and conservation easement. The DEP points to the FWPA as granting it authority to enter and inspect property, without having to obtain a prior search warrant, to ascertain compliance with the Act's provisions, rules, regulations, permits, and orders. The DEP also relies on the existence of a conservation easement as providing additional support for the DEP inspector's right to enter and inspect the property. Further, the DEP maintains that no prior warrant is required under the FWPA's inspection scheme. Because the Hubers' property contains wetlands that are subject to general FWPA control and a specific permit obligation, the property should be considered closely regulated. The DEP argues that warrantless searches have been permitted for pervasively or closely regulated industries operating under a statutory scheme, particularly for regulation aimed at protecting the environment.

Moreover, the DEP maintains that any reliance on *Camara* is misplaced because here, unlike *Camara,* there was no vaguely applicable administrative scheme that purportedly granted the DEP representative warrantless access to private parts of a home. In fact, a dwelling was not the focus of the inspection at all. Rather, the inspected property was improperly filled-in backyard wetland area, which should have been kept in its natural state in accordance with the FWPA permit. The DEP contends that the inspected land should not receive special privacy protection by

labeling it "curtilage" (here used to encompass all of the Hubers' lawned property) when the property was converted to such use only by violating the permit and filling in protected wetland areas to create a lawn and other improvements on the Hubers' back property.

## IV.

We turn first to the Fourth Amendment argument concerning the inspection conducted by Nystrom on July 3, 2002.

Settled principles govern the legality of searches of persons and places. The Fourth Amendment to the United States Constitution, as well as its parallel provision in Article I, Paragraph 7 of the New Jersey Constitution, guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const.* amend. IV; *see N.J. Const.* art. I, ¶ 7; *see also State v. Johnson*, 193 *N.J.* 528, 541, 940 *A.*2d 1185 (2008). Both provisions provide vigilant protection against unreasonable searches of a person's dwelling because a nonconsensual, warrantless search of a person's residence is the "chief evil against which the wording of the Fourth Amendment is directed." *Johnson, supra*, 193 *N.J.* at 554, 940 *A.*2d 1185 (quoting *Welsh v. Wisconsin*, 466 *U.S.* 740, 748, 104 *S.Ct.* 2091, 2097, 80 *L.Ed.*2d 732, 742 (1984)); *see also Florida v. Jardines*, 569 *U.S.* ——, 133 *S.Ct.* 1409, 1414, 185 *L.Ed.*2d 495, 501 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *United States v. Martinez–Fuerte*, 428 *U.S.* 543, 561, 96 *S.Ct.* 3074, 3084, 49 *L.Ed.*2d 1116, 1130 (1976) ("[T]he sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection.").

Under the United States Supreme Court's formulation, warrantless searches are "per se unreasonable." *Katz v. United States*, 389 *U.S.* 347, 357, 88 *S.Ct.* 507, 514, 19 *L.Ed.*2d 576, 585 (1967); *accord Johnson, supra*, 193 *N.J.* at 552, 940 *A.*2d 1185 (stating "warrantless searches or seizures are 'presumptively unreasonable.'" (quoting *State v. Elders*, 192 *N.J.* 224, 246, 927 *A.*2d

1250 (2007))). The Supreme Court repeatedly and recently has reiterated its strong view against warrantless searches, which are unreasonable outside of "well-delineated exceptions." *City of Ontario v. Quon*, 560 *U.S.* ——, 130 *S.Ct.* 2619, 2630, 177 *L.Ed.*2d 216, 228 (2010) (quoting *Katz, supra,* 389 *U.S.* at 357, 88 *S.Ct.* at 514, 19 *L.Ed.*2d at 585); *Arizona v. Gant,* 556 *U.S.* 332, 338, 129 *S.Ct.* 1710, 1716, 173 *L.Ed.*2d 485, 493 (2009) (same). Thus, the burden of establishing an exception to the general warrant requirement falls to the government in order to sustain the reasonableness of a warrantless search. *See Welsh, supra,* 466 *U.S.* at 750, 104 *S.Ct.* at 2098, 80 *L.Ed.*2d at 743.

■ That obligation pertains generally to government intrusions for there is no doubt that the Fourth Amendment's constitutional prohibition against warrantless searches applies to civil, as well as criminal, governmental intrusions. *See Camara, supra,* 387 *U.S.* at 528–29, 87 *S.Ct.* at 1730–31, 18 *L.Ed.*2d at 935 (holding that warrantless inspection of private dwelling by municipal administrator without owner consent is generally unreasonable absent limited circumstances); *See v. City of Seattle,* 387 *U.S.* 541, 545–46, 87 *S.Ct.* 1737, 1740–41, 18 *L.Ed.*2d 943, 947–48 (1967) (holding that administrative entry, in absence of consent, to non-public portions of commercial establishment may be enforced only through framework of warrant procedure). In the companion cases of *Camara* and *See,* the United States Supreme Court overturned *Frank v. Maryland,* 359 *U.S.* 360, 79 *S.Ct.* 804, 3 *L.Ed.*2d 877 (1959), which previously held that warrantless administrative inspections were constitutional.

Review of Fourth Amendment case law sheds additional light on the evolution of administrative inspections, which are part of the larger realm of administrative searches conducted in furtherance of regulatory programs.[8] One line of cases concerns the circum-

---

[8] *See generally* 5 Wayne R. LaFave, *Search and Seizure* § 10.1 (5th ed.2012). Administrative inspection of private non-commercial land, subject to a stringent regulatory permit controlling activity on it, is the narrow focus of this appeal.

scribed areas where warrantless regulatory inspections have been approved for use. We turn to that exception to the warrant requirement first to determine its applicability in this matter. We then examine pertinent case law addressing regulatory inspection schemes that have been found to be reasonable from a Fourth Amendment search perspective because resort to judicial process eliminated the possibility of forcible, nonconsensual entry onto private property.

## V.

### A.

In *Burger, supra,* the United States Supreme Court authorized a limited exception to the warrant requirement for administrative inspections of commercial premises in a closely regulated business, stating that

> [b]ecause the owner or operator of *commercial premises in a "closely regulated" industry* has a reduced expectation of privacy, the warrant and probable-cause requirements ... have lessened application in this context.... This warrantless inspection, however, *even in the context of a pervasively regulated business,* will be deemed to be reasonable only so long as three criteria are met.
>
> [482 *U.S.* at 702, 107 *S.Ct.* at 2643–44, 96 *L.Ed.*2d at 613–14 (emphasis added) (internal citations omitted).]

*Burger* set out criteria for assessing the reasonableness of a warrantless inspection of a closely regulated business, and those criteria have been adopted for use in this state. *Burger, supra,* which was adopted and summarized by our Appellate Division in *Turcotte, supra,* 239 *N.J.Super.* at 291–94, 571 *A.*2d 305, requires that (1) a substantial governmental interest must underlie the regulatory scheme authorizing the search; (2) "the warrantless inspections must be necessary to further [the] regulatory scheme"; and (3) the statutory scheme "must advise the owner of the commercial premises that the search is being made pursuant to

---

However, we note recent critical discussion of administrative search doctrine generally, in respect of its ability to check arbitrary or harassing searches of persons or places. *See, e.g.,* Eve Brensike Primus, *Disentangling Administrative Searches,* 111 *Colum. L.Rev.* 254 (2011).

the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." 482 *U.S.* at 702–03, 107 *S.Ct.* at 2644, 96 *L.Ed.*2d at 614 (first alteration in original) (internal quotation marks omitted). In order to fulfill the third criterion, the statutory scheme must make a commercial property owner "aware that his property will be subject to periodic inspections undertaken for specific purposes[,]" and must " 'carefully limit[ ]' " the inspector's discretion " 'in time, place, and scope.' " *Id.* at 703, 107 *S.Ct.* at 2644, 96 *L.Ed.*2d at 614 (quoting *United States v. Biswell,* 406 *U.S.* 311, 315, 92 *S.Ct.* 1593, 1596, 32 *L.Ed.*2d 87, 92 (1972)).

When established by the United States Supreme Court, the footings to the *Burger* framework were fixed firmly in the review of administrative searches conducted of commercial properties. *See id.* at 693–96, 107 *S.Ct.* at 2639–40, 96 *L.Ed.*2d at 608–10 (setting forth factual predicates to administrative action under review). Furthermore, the historical explanation for recognizing this particular warrant exception buttressed the Supreme Court's focus only on allowing such administrative searches of commercial property used for purposes associated with closely or pervasively regulated businesses. *See id.* at 700, 107 *S.Ct.* at 2642–43, 96 *L.Ed.*2d at 612–13 (citing as examples *Colonnade Catering Corp. v. United States,* 397 *U.S.* 72, 90 *S.Ct.* 774, 25 *L.Ed.*2d 60 (1970) (liquor dealerships) and *United States v. Biswell,* 406 *U.S.* 311, 92 *S.Ct.* 1593, 32 *L.Ed.*2d 87 (1972) (firearms)). The Court emphasized the lesser expectation of privacy present in a closely regulated business, stating that

> the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search have lessened application in this context. . . . [W]here the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.
>
> [*Id.* at 702, 107 *S.Ct.* at 2643–44, 96 *L.Ed.*2d at 613–14 (citations omitted).]

### B.

In the appeal before us, the Appellate Division's analysis stretched beyond the clearly commercial factual foundation to

*Burger* when the panel imported *Burger*'s holding as a basis for generally validating warrantless entry and inspection of residential property under the FWPA. The factual setting and historical perspective to the exception for pervasively or closely regulated businesses noted in *Burger* fail to provide support for a general extrapolation of *Burger*'s holding permitting a limited area of warrantless administrative searches to the more heightened privacy interests that are associated with a private, residential property. *Burger* arose in a commercial business setting, *id.* at 693–96, 107 *S.Ct.* at 2639–40, 96 *L.Ed.*2d at 608–10, and its emphasis on the lesser privacy interests in such settings, particularly when highly regulated work is performed, *id.* at 702, 107 *S.Ct.* at 2643–44, 96 *L.Ed.*2d at 613–14, does not encourage *Burger*'s extension outside of the commercial setting of a closely regulated industry. We perceive no intimation of support in *Burger* for such a result.

We thus dispense first with the *Burger* analysis that was used in part by the appellate panel—and reject it—simply to dispel any reliance on that aspect of the panel's analysis in our determination in this matter. The regulatory inspection scheme of the FWPA was applied here to residential property and, in that setting, we hold that *Burger*'s exception to the warrant requirement is inapplicable.

## VI.

Administrative inspection schemes can be found to operate consistently with Fourth Amendment principles, notwithstanding the lack of a requirement that a warrant be secured in advance of seeking entry to the premises. Critical to the inquiry is whether such regulatory inspection provides for forcible entries without a warrant when consent is denied. The United States Supreme Court has signaled that, when consent is denied, forcible entry must proceed within the framework of the warrant procedure.

The Supreme Court addressed such circumstances in the context of holding that Occupational Safety and Health Administra-

tion (OSHA) inspections of businesses did not rise to the level of being considered a closely regulated industry entitled to conduct warrantless searches. *See Marshall v. Barlow's, Inc.*, 436 *U.S.* 307, 98 *S.Ct.* 1816, 56 *L.Ed.*2d 305 (1978) (holding that OSHA's regulation of all businesses engaged in interstate commerce does not fall within narrow exceptions permitting warrantless entry). In *Barlow's*, the Supreme Court reviewed OSHA's inspection scheme and considered the Secretary of Labor's argument that inspection efficiency would be impeded by advance notice and delay associated with imposition of a warrant requirement when a businessman denies consent to an OSHA inspector's entry onto the premises. However, the Court pointed to a regulation that authorized the taking of "appropriate action, including compulsory process, if necessary" where entry is refused. *Id.* at 317, 98 *S.Ct.* at 1823, 56 *L.Ed.*2d at 314 (citation omitted). In its assessment of the OSHA inspection scheme, the Court acknowledged that process to enforce a reasonable, non-arbitrary inspection scheme can be compliant with Fourth Amendment protections, despite the lack of consent by the property owner, provided the regulatory scheme advances important governmental interests, takes into account reasonable expectations of privacy, and avoids nonconsensual, forcible entry accomplished outside of the warrant framework. *Id.* at 320–25, 98 *S.Ct.* at 1824–27, 56 *L.Ed.*2d at 316–19.

*Barlow's* is not the only instance in which the Supreme Court has signaled that a legislative determination to establish standards for reasonableness for searches and seizures can receive favored treatment where that process does not include "forcible entries without a warrant." *Colonnade, supra,* 397 *U.S.* at 77, 90 *S.Ct.* at 777, 25 *L.Ed.*2d at 65. In *Colonnade, supra,* although the Court suppressed evidence seized forcibly from a private area of a commercial establishment, it commented favorably on the congressional choice to select a different course of action when consent is denied, noting that Congress "selected a standard that does not include forcible entries without a warrant [but rather] ma[de] it an offense for a licensee to refuse admission to the inspector." *Ibid.; see also Wyman v. James,* 400 *U.S.* 309, 325–26, 91 *S.Ct.* 381, 390–

94, 27 *L.Ed.*2d 408, 418–19 (1971) (upholding cessation of welfare benefits to recipient who refused consent to caseworker for home visit and no forcible entry ensued).

With that general background in mind, the DEP's authority to enter and inspect private land subject to a FWPA permit and transition area waiver must be examined in order to gain a proper understanding of how the FWPA scheme was meant to operate. No doubt, the Fourth Amendment provides the framework for assessing the reasonableness of the FWPA administrative scheme that authorizes inspection of property in order to enforce the Act.

## VII.

### A.

As noted at the outset of this opinion, the FWPA preserves and protects wetlands by strictly prohibiting their disturbance and superimposing a permitting scheme that allows for certain activities to take place in and around them only with DEP approval. *See N.J.S.A.* 13:9B–9. In enacting the FWPA, the Legislature declared that it was "in the public interest to establish a program for the systematic review of activities in and around freshwater wetland areas designed to provide predictability in the protection of freshwater wetlands." *N.J.S.A.* 13:9B–2. As part of its grant of means to the DEP to secure compliance with the FWPA's policies, the Act confers a right of entry to inspect and enforce the FWPA. *N.J.S.A.* 13:9B–21(m) provides:

> The department shall have the authority to enter any property, facility, premises or site for the purpose of conducting inspections, sampling of soil or water, copying or photocopying documents or records, and for otherwise determining compliance with the provisions of this act.

On its face and read in isolation, *N.J.S.A.* 13:9B–21(m) suggests that the DEP has the right to enter and inspect any property for compliance with the FWPA.[9] Thus read, the plain language of the Act appears exceedingly broad.

---

[9] In this regard, it is similar to the language in OSHA that, the Secretary argued, conferred an absolute right to warrantless entry. *See Barlow's, supra,* 436 *U.S.* at 317 n. 12, 98 *S.Ct.* at 1823 n. 12, 56 *L.Ed.*2d at 314 n. 12.

■        However, our task in statutory interpretation is to discern and effectuate the Legislature's intent. *Hubner v. Spring Valley Equestrian Ctr.*, 203 *N.J.* 184, 194, 1 *A.*3d 618 (2010). In doing so, we look first to the Legislature's plain language, *see DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005), and we must examine that language sensibly, in the context of the overall scheme in which the Legislature intended the provision to operate, *see Merin v. Maglaki*, 126 *N.J.* 430, 436, 599 *A.*2d 1256 (1992). We also have found it useful when engaging in statutory construction to take into account the interpretation and cognate enactments of the agency to which the Legislature has entrusted the statute's implementation. *See In re Young*, 202 *N.J.* 50, 63, 995 *A.*2d 826 (2010). Examination of the FWPA's interrelated statutory provisions and regulations reveals a series of steps that are generally pertinent to the Act's enforcement, and which specifically inform how the Act provides for an enforceable right of entry for inspection and monitoring of freshwater wetlands and related transition areas that are subject to a FWPA permit.

In implementing the statutory right to enter and inspect property, the DEP has enacted a regulation specifying the obligations of both the permittee and the DEP inspector who seeks entry to land subject to a FWPA permit. *N.J.A.C.* 7:7A–13.1(a)(9) provides that a FWPA permit holder is expected to allow an inspector to have access to enforce compliance with the provisions of the Act. It states:

Inspection and entry: The permittee shall allow the Department, or an authorized representative, upon the presentation of credentials, to:

i. Enter upon the permittee's premises where a regulated . . activity is located or conducted, or where records must be kept under the conditions of the permit; [and]

. . . .

iv. Sample or monitor at reasonable times, for the purposes of assuring compliance or as otherwise authorized by the Federal Act, by the Freshwater Wetlands Protection Act, or by any rule or order issued pursuant thereto, any substances or parameters at any location[.]

The regulation thus elucidates two points. First, it places a permittee on notice that owning property that is subject to a

FWPA permit renders the property, at reasonable times, subject to a right of entry by a DEP representative for the purpose of an inspection for compliance with the Act. The regulation reinforces the language of *N.J.S.A.* 13:9B–21(m) by requiring that the permittee "shall allow" the DEP's representative the right of entry. Second, it imposes a first step to be taken by the DEP inspector when seeking to exercise the right of entry: presentation of credentials to the permittee. That important, initial step implicitly incorporates a threshold obligation to interact with the permittee prior to exercising the statutory right to enter, inspect, and sample or monitor at reasonable times.

Further, the regulatory scheme provides a remedy for denial of access by a permittee. *N.J.A.C.* 7:7A–16.11 authorizes the DEP to assess a separate civil administrative penalty under the FWPA against a person who "refuses, inhibits or prohibits" the DEP representative's lawful entry, and it permits the DEP to treat "[e]ach day that a [permittee] refuses ... entry" as an "additional, separate, and distinct violation." That approach dovetails with the orderly legislative scheme for enforcement of FWPA violations of all variety. Read in its totality, the FWPA's violations provision, *N.J.S.A.* 13:9B–21, reveals a thorough process for securing compliance with the important public policies advanced by the FWPA.

*N.J.S.A.* 13:9B–21 provides specific enforcement instructions to the DEP, and the enforcement mechanisms supply the architecture not only to ensure that the DEP can inspect permitted areas but also to penalize property owners who do not comply with the terms of a wetlands permit. In particular, *N.J.S.A.* 13:9B–21 grants the Commissioner multiple means for securing compliance with the Act. Under *N.J.S.A.* 13:9B–21(b), the Commissioner may issue an order whenever he "finds a person in violation of any provision of this [A]ct, or of any rule or regulation adopted, or permit or order issued." In such circumstances, the Commissioner is authorized to issue an order that identifies the specific basis for the violation and cites the action that constituted the violation, requires the violator to come into compliance with the particular

requirement, and can require restoration of the wetlands or transition area that is the site of the violation. *Ibid.* The order also must provide notice of a right to a hearing. *Ibid.*

In addition to issuing such orders, the Commissioner may proceed by way of "civil action in Superior Court for appropriate relief from any violation of any provisions of this [A]ct, or any rule or regulation adopted, or permit or order issued." *N.J.S.A.* 13:9B–21(c). Through a civil action brought under subsection (c), the Commissioner has the authority to obtain, among other relief, temporary or permanent injunctive relief, *N.J.S.A.* 13:9B–21(c)(1), and the assessment of costs against the violator for the expenses of any investigation, "and for the reasonable costs of preparing and bringing the legal action," *N.J.S.A.* 13:9B–21(c)(2).

Thus, through the combined powers granted under *N.J.S.A.* 13:9B–21(b) and (c), the Commissioner can issue orders to permittees who refuse entry to inspectors who have presented their credentials and have been denied access, charging such persons with a violation of a provision of the Act and of a regulation to which the permittee is subject by virtue of being a permittee. The Commissioner can bring a civil action to secure enforcement of such an order, including the securing of judicial injunctive relief in the form of a court order directing the entry that was sought and denied. Further, the Commissioner may separately assess a violation for the denial of entry by a permittee, which is chargeable as a separate administrative violation. *N.J.A.C.* 7:7A–16.11.

### B.

Although the Act expects permittee consent, and will penalize the permittee who denies a DEP representative reasonable entry onto property to inspect for compliance with the Act, the inspection scheme taken as a whole does not purport to authorize forcible, nonconsensual entry into the backyard of a residential property owner. Rather, the Act provides a means for the DEP to obtain judicial access to secure a court-issued injunctive order authorizing the administrative search to which the DEP is enti-

tled. Here, as in *Barlow's, supra,* the regulatory scheme repre-
sents a choice to proceed by process when entry is refused, and its
effectiveness should not be hobbled by that requirement, just as
OSHA's was not. *See* 436 *U.S.* at 319, 98 *S.Ct.* at 1823–24, 56
*L.Ed.*2d at 315–16. Implementing regulations anticipate notice to
the permit holder upon the presentation of credentials by an
inspector, *N.J.A.C.* 7:7A–13.1(a)(9), and enforcement is furthered
through a Commissioner order, issued under *N.J.S.A.* 13:9B–21(b),
and, if necessary, through the available judicial process authorized
by *N.J.S.A.* 13:9B–21(c). In this context, the standard of proof to
gain court-ordered entry to a property is different than probable
cause in the criminal context; probable cause in the administra-
tive-search context "may be based not only on specific evidence of
an existing violation but also on a showing that 'reasonable
legislative or administrative standards for conducting an ... in-
spection are satisfied.' " *Barlow's, supra,* 436 *U.S.* at 320, 98 *S.Ct.*
at 1824, 56 *L.Ed.*2d at 316 (1978) (footnote omitted) (quoting
*Camara, supra,* 387 *U.S.* at 538, 87 *S.Ct.* at 1736, 18 *L.Ed.*2d at
941).

The FWPA's inspection scheme cannot fairly be viewed as
unreasonable as applied to a residential homeowner whose proper-
ty is subject to a FWPA permit because, by seeking the permit to
disturb land on or near otherwise statutorily protected wetlands, a
landowner and his or her successors in title are bound to compli-
ance with the permit. That includes compliance with the permit-
ting scheme's mechanism that authorizes reasonable entry onto
land affected by the permit [10] to ensure that these valuable natural

---

[10] As for the provision in *N.J.S.A.* 13:9B–21(m) for the securing of books and
records, we need not address that in a non-commercial setting such as this
because no such activity was taken here, and we decline to issue what would
amount to an advisory opinion concerning its application to a commercial entity
that might trigger a *Burger* analysis. We also are not faced with a situation
where the DEP entered property not subject to a FWPA permit but which the
DEP has reason to believe contains wetlands being infringed upon. Nor are we
faced with a situation where a DEP inspector entered private property that may
be considered open fields. *See, e.g., Air Pollution Variance Bd. of Colo. v. W.*

resources are maintained as required by the conditions of the permit. Indeed, if the DEP could only inspect the permitted areas on the basis of probable cause that a violation had occurred, the damage would already be done, and the FWPA would be relegated to a damages recovery mechanism. Such an interpretation would undermine the proactive role taken by the Legislature for protecting, in advance, freshwater wetlands from disturbance. *See Hubner, supra,* 203 *N.J.* at 194, 1 *A.*3d 618 (reiterating judicial responsibility to discern and implement legislative intent); *Merin, supra,* 126 *N.J.* at 436, 599 *A.*2d 1256 (same). Rather, probable cause must be understood in the context of the legislative and administrative regulatory program that includes a right to access and inspect property.

Here, the regulatory scheme anticipates thoughtful steps and provides constitutional recourse for the DEP to secure access to inspect land subject to a FWPA permit for compliance with the strict protections placed on freshwater wetlands and transition areas. Moreover, the permitting scheme ensures that an order is issued to gain peaceful, nonforcible entry to inspect at a reasonable time when consensual entry is denied and access must be compelled. Hence, the order demanding entry that the Commissioner may issue, and that the Superior Court may enforce, need simply request entry [11] in order for the DEP to proceed with a statutory inspection program that is neither arbitrary nor capricious. *Cf. Barlow's, supra,* 436 *U.S.* at 320–25, 98 *S.Ct.* at 1824–27, 56 *L.Ed.*2d at 316–19.

*Alfalfa Corp.,* 416 *U.S.* 861, 94 *S.Ct.* 2114, 40 *L.Ed.*2d 607 (1974) (explaining federal "open fields" exception to Fourth Amendment as applied to state air pollution inspector). We only are concerned here with the physical entry onto outdoor land in a residential backyard that contained freshwater wetlands and transition areas that were intended to be protected from human disturbance through the careful permitting process of the FWPA.

[11] The DEP must show that the property in question is subject to a valid FWPA permit and that access was requested and denied.

██ Turning to consideration of the permittee's expectation of privacy, when a private land owner takes property subject to a recorded deed restriction that allowed development to occur conditioned on the issuance of a carefully delineated wetlands permit and transition area waiver, the permittee cannot claim a full expectation of privacy to such protected lands. As previously noted, a permittee must recognize he or she is bound to the permit scheme as part of seeking DEP approval to disturb statutorily protected wetlands and transition areas that are otherwise secured from damaging contact for the public's benefit. Put simply, the rights of the FWPA permittee are subject to the statutory scheme by which the permit operates, and that includes submitting to a reasonable inspection scheme. In view of the vital importance of protecting freshwater wetlands in New Jersey, privacy expectations to freshwater wetlands and transition areas that are subject to a FWPA permit are diminished. The FWPA declared wetlands to be so imbued with a public interest that such land cannot be developed under the FWPA. *See N.J.S.A.* 13:9B–11. When development at or near them is allowed, the land must be maintained as conditioned in the permit and transition area waivers that are issued to allow the landowner some nearby use of otherwise restricted property. In effect, a property owner receives the right to develop restricted land in exchange for giving the right of reasonable entry to the DEP to inspect. To be sure, this bargained-for exchange is subject to the reasonableness of the entry and search.

That said, in recognizing that a FWPA permittee is subject to the legislative provisions governing the permitting scheme, we do not suggest that any permit issued by any governmental entity may now bear a condition foisting on the homeowner a duty to accept a right of suspicionless entry by the government. To be sure, we do not believe that the Legislature intended, by inclusion of *N.J.S.A.* 13:9B–21(m) in the FWPA, to grant to the DEP a commission to demand entry onto any and all residential property wherever wetlands may be present or have the property owner risk daily administrative penalties, in order to ferret out suspected

illegal activities. Such a broad and sweeping interpretation of the subsection risks violating the federal and state constitutional prohibitions against unreasonable searches. *See Gallenthin Realty Dev., Inc. v. Borough of Paulsboro,* 191 *N.J.* 344, 359–60, 924 *A.*2d 447 (2007) (explaining that principles of statutory construction obligate courts to interpret statutes to avoid unconstitutional applications). However, we need not decide what showing is required under the FWPA for the DEP to gain entry to residential property that is not subject to a FWPA permit, and we leave for another day the application of such circumstances in the context of open fields or when entry is sought in other nonresidential settings. *See supra* n. 10 (op. at 368–69, 63 *A.*3d at 215–16).

In the factual setting presented by this appeal, we hold that based on the FWPA's integrated scheme governing freshwater wetlands in New Jersey, land subject to FWPA restrictions so important as to be required by law to be filed of record, which was done here, is subject to the statutory, reasonable right of entry and inspection.[12]   In exercising that right, the DEP must comply with its processes, which require presentation of credentials before seeking consent to entry at reasonable times. If entry is denied, the Commissioner may order that entry be provided, *N.J.S.A.* 13:9B–21(b), and the DEP shall be entitled, pursuant to the rules of court, to judicial process to compel access to the property subject to the FWPA permit, *see N.J.S.A.* 13:9B–21(c).

## VIII.

In addition to relying on FWPA authority to inspect the Hubers' property, the DEP also claims a right of entry to inspect pursuant to a conservation easement granted under the New Jersey Conservation Restriction and Historic Preservation Re-

---

[12] The DEP's own regulations require that the entry and inspection be accomplished at a reasonable time, and its routine procedures for conducting the inspection leave no room for unreasonable disturbance of the property. Indeed, our review of the federal manual reveals that the borings taken to assess the soil quality are minimal.

striction Act (Preservation Act). *N.J.S.A.* 13:8B–1 to –9. The Preservation Act allows the DEP to acquire conservation restrictions, and the DEP may enforce a conservation restriction by entering the land to assure compliance with the restriction. *N.J.S.A.* 13:8B–3.

The Hubers argue, however, that the conservation easement cannot be relied upon because the DEP inspector did not claim any knowledge of it, or place any reliance on it, when he sought entry onto their land. In fact, the record supports that Nystrom was unaware of any encumbrances on the Hubers' property at the time of his site inspection.

We recognize that the parties sharply dispute whether the DEP has a right to enter and inspect land subject to a conservation easement, generally as a matter of law, and specifically as applied to the conservation easement in this matter, which was deeded to the Township of Clinton. For our resolution of this appeal, we decline to address the DEP's post-hoc rationalization for its entry onto private property because we conclude that the DEP maintains authority to nonforcibly enter residential property subject to a FWPA permit, and may enforce access through judicial process if the permittee does not consent.

That said, it bears repeating that the DEP must shoulder the burden of demonstrating the legal bases for its entry onto the parts of property inspected, and that brings us, finally, to an examination of the record actually before us.

## IX.

Ordinarily, an issue may not be raised on appeal if not raised in the proceedings below. *N.J. Div. of Youth & Family Servs. v. M.C. III*, 201 *N.J.* 328, 339, 990 *A.*2d 1097 (2010). Although constitutional issues arising in administrative law proceedings may be raised for the first time on appeal, there is undoubted benefit that comes when the issue is raised during an agency's adjudication of a matter within its jurisdiction. There is no doubt that "[a]dministrative agencies have the power to pass on

constitutional questions where relevant and necessary to the reso-
lution of a question concededly within their jurisdiction." *Chris-
tian Bros. Inst. of N.J. v. No. N.J. Interscholastic League*, 86 *N.J.*
409, 416, 432 *A.*2d 26 (1981) (citing *Hunterdon Cent. High Sch. Bd.
of Educ. v. Hunterdon Cent. High Sch. Teachers' Ass'n*, 174
*N.J.Super.* 468, 474–75, 416 *A.*2d 980 (App.Div.1980), *aff'd o.b.*, 86
*N.J.* 43, 429 *A.*2d 354 (1981)). Our courts have long recognized
that "administrative agencies are competent to pass upon constitu-
tional issues germane to proceedings before them" and have
acknowledged that it is preferable for that to occur because it
"better focus[es] the issues for judicial review, if such action is
later necessary." *Hunterdon Cent., supra*, 174 *N.J.Super.* at 475,
416 *A.*2d 980 (quoting *Alcala v. Wyo. State Bd. of Barber Exam'rs*,
365 *F.Supp.* 560, 564 (D.Wyo.1973)). Indeed, this Court has
operated under an expectation that an administrative agency could
and would, where appropriate, address such issues. *See, e.g.,
Winston v. Bd. of Educ. of S. Plainfield*, 64 *N.J.* 582, 586–87, 319
*A.*2d 226 (1974) (remanding to Commissioner of Education for
hearing where First Amendment issue would be addressed in
removal proceeding for tenured teaching staff member).

The benefit from having the administrative process initially
address a constitutional issue among other issues within the
agency's purview is that the process may result in fact-finding or
interpretation and application of statutory processes that may
obviate the need to adjudicate a constitutional question. *See
Paterson Redevelopment Agency v. Schulman*, 78 *N.J.* 378, 386–
87, 396 *A.*2d 573, *cert. denied*, 444 *U.S.* 900, 100 *S.Ct.* 210, 62
*L.Ed.*2d 136 (1979). In this matter, the obvious benefits that
would have emerged from having the constitutional issue raised at
the hearing before the administrative agency leap off the pages of
this record. Had the issue been raised at that time, the relevance
of the disputed factual accounts about Nystrom's entry for the
inspection on July 3, 2002, would have been apparent and resolved.

Instead, only after the conclusion of the hearing, the issuance of
an initial decision, the filing of exceptions by both parties, and the

issuance of the Commissioner's decision was there a constitutional claim raised and an objection made to the inclusion of a portion of the testimony that was considered. It would be inappropriate for this Court to address the credibility dispute that arose over Nystrom's and Mr. Huber's different accounts of whether Nystrom was refused access to the property to perform his inspection. *See Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 587, 538 *A.*2d 794 (1988) (noting that fact-finding deference on matters of credibility is due to one who hears testimony). And we expressly do not. That said, we are not prevented thereby from bringing this matter to conclusion. Although the Hubers' argument about the exclusion of this testimony comes late, when reviewing the record exclusive of the testimony of Nystrom as to his inspection on July 3, 2002, it is apparent that there was more than sufficient evidence to sustain the findings of a violation here. *See In re Taylor,* 158 *N.J.* 644, 656-57, 731 *A.*2d 35 (1999).

Based on the evidence relating to the site visit conducted by Perez on August 15, 2002, and additional dates, as well as the aerial and other photographs in evidence and, especially, the Hubers' own admissions, disturbance of wetlands and transition area was proved by the DEP. The evidence recited in the ALJ's fact-findings, *see supra* at 352-53, 63 *A.*3d at 205-06, demonstrates that he relied on that evidence in reaching his conclusions. Our own review of the record leads us to conclude that the aforesaid portions of the record provided a sufficient and credible basis for sustaining the administrative penalty and restoration remedy ordered by the DEP. We therefore reject the argument that there was insufficient credible evidence in the record, even when one excludes consideration of Nystrom's testimony based on his July 3, 2002 inspection, to sustain the findings and conclusions of the ALJ, as adopted by the Commissioner.

X.

We affirm the Appellate Division's judgment upholding the administrative order and penalty entered by the Commissioner.

We reject the argument that there was insufficient credible evidence in the record to sustain the findings and conclusions of the ALJ, as adopted by the Commissioner. And, we further conclude that the additional arguments advanced by petitioners, which were rejected by the Appellate Division for the reasons summarized herein, *see supra* Part II, do not require further discussion.

As modified by this opinion, the judgment of the Appellate Division is affirmed.

Chief Justice RABNER; Justices ALBIN, HOENS, and PATTERSON; and Judges RODRÍGUEZ and CUFF (both temporarily assigned) join in Justice LaVECCHIA's opinion.

*For affirmance as modification*—Chief Justice RABNER, and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, RODRÍGUEZ (t/a) and CUFF (t/a)—7.

*Opposed*—None.